BODLEY, J.,
— Following trial before the undersigned and a jury on November 25 and 26, 1968, Donald Gray was found guilty of burglary, larceny, receiving stolen goods, conspiracy and possession of burglary tools. Motions for new trial and in arrest of judgment were duly filed and have been argued before the court en banc. The sole question presented to the court for disposition is whether or not the trial judge erred in his comments to the jury concerning the defense of intoxication. The relevant facts follow.
*148 At approximately 2 a.m. on January 31, 1968, a Falls Township police officer noticed a 1954 green and white Chevrolet bearing Virginia license plates pull into the parking lot of a shopping center. Since all of the business establishments, with the exception of one bar, were closed for the night, the officer’s suspicions were aroused. Two males were seen by the officer to alight from the vehicle, one being defendant and the other identified later as James Buchanan. Defendant entered the bar while Buchanan walked off in another direction. A few minutes later Gray came out of the bar, entered the automobile (later identified as being owned by Buchanan) and drove out onto the highway. At this point, the officer lost the vehicle in traffic.
At 3:39 a.m. the officer who had observed this activity received a radio message indicating that a burglar alarm in an establishment known as Frank’s Market and situated immediately adjacent to the bar mentioned above had sounded at the police headquarters. Following the arrival of other officers and careful investigation, Buchanan was observed inside of the establishment. He was seen to climb onto a display counter and then disappear into the ceiling of the market. Shortly thereafter, Buchanan was arrested on the roof of the market near a hole which had been cut therein and through which Buchanan had presumably gained access to the market. A sum of money was found stacked in a pile on the roof near a burlap bag which contained burglary tools of various descriptions.
Search was then instituted for the green and white Chevrolet and at approximately 5:30 a.m. the car was located in a parking lot immediately across the street from Frank’s Market, but parked to the rear of a tavern. Defendant Gray was lying across the *149 front seat of the car, presumably asleep. In his possession, upon search, was found a glass cutter and a form of “prying” tool referred to by defendant as a tack puller. The keys to the car were in the ignition. Search of the vehicle revealed many more tools of the type customarily used by burglars.
At the trial of the case, the arresting officer testified that upon being aroused from the seat of the car, defendant’s first inquiry was “what am I being arrested for, suspicion of burglary?”. The officer stated that he replied to this question in the affirmative. According to the officer, Gray later told him that Buchanan had asked his help in connection with his intention to “hit” a store, but Gray told Buchanan that he did not want to participate because there had been too many “jobs” in that area lately and he felt that the heat was on. Gray went on to say to the officer, according to the latter’s testimony, that he had been drinking during the evening and had allowed himself to be convinced that he should assist Buchanan even though it was against his better judgment. He also allegedly told the officer that if he had known that Buchanan had been “rumbled” (apprehended) he would have left the scene before his (Gray’s) apprehension.
Defendant testified that he had been drinking beer and whiskey during the afternoon of January 30th and had consumed a couple of “six packs” and five or six shots of whiskey between noontime and 5 p.m. He testified that he then went to various bars where he had more beer and whiskey until midnight when he met Buchanan. Gray said that he and Buchanan stayed at the bar where they met until about 1:30 a.m., continuing to drink. He admitted having been with Buchanan when first observed by the police and stated that he went into the bar for a drink but *150 didn’t know where Buchanan had gone. He said that he was “drunk” at 2 a.m. when the policeman had observed him first and that he had been on a drunk for quite a while before that.
He was asked by his counsel whether or not there ever had been any agreement between him and Buchanan to burglarize Frank’s Market and his response was: “I advised Mr. Buchanan not to burglarize anything.” Again he was asked: “Was there any agreement between you and Mr. Buchanan to go to burglarize Frank’s Unity Market?” His response was: “No.”
Defendant testified that he parked behind the inn, where he was later apprehended, at about 2:15 a.m. and went to sleep there because he was intoxicated. He said that the next thing he remembered was the officers at the door of the car and stated that he was told by them that he was being arrested for vagrancy. Defendant testified that he did not “recollect” telling the police that he would have left the scene had he known that Buchanan had been rumbled. He further stated that he did not recall any specific facts about the evening since he was “pretty well intoxicated.” And he explained that the glass cutter and tack puller or prying tool were items that he was in the habit of carrying around. No testimony was offered by anyone other than defendant with respect to his alleged intoxication.
Defendant testified in painstaking detail with respect to all of his activities from noon of the preceding day until the time he allegedly went to sleep, 2:15 a.m., on the date of his arrest. After testifying that he had advised Buchanan not to burglarize anything and that he had made no agreement with Buchanan concerning the burglary committed at Frank’s Market, defendant testified further with *151 respect to exactly what he did when he left the tavern which he was seen to enter by the Falls Township policeman. He stated that he left the tavern in order to go to the Village Inn. When asked as to its location, he testified that it was 150 yards from the bar. He was asked the time and he said it was “right around 2 o’clock.” He was asked what he did there; he testified that he had a drink or perhaps two. He also said that he didn’t see anyone he knew in there and accordingly left the bar since it was closing. His counsel inquired of him as to his purpose for looking for someone he knew, and defendant responded that he had hoped to get a lift home. Not being successful, he said, he then went to sleep in the car back of the Village Inn. He was asked the time that he went to sleep. He said it was probably quarter after two. And, of course, when he was asked why he went to sleep he said that he was drunk.
He knew exactly where Frank’s Market was located, that is to say, immediately next to the bar he had entered.
On crossexamination, the assistant district attorney took him back over the events of the afternoon and evening leading up to the time when he allegedly went to sleep. He recalled arriving at Lou’s Tavern on Route 413 about 7 pirn. and remembered staying there until about 10:30 p.m. He knew that he did not meet any of his acquaintances there that night, but knew the bartender on duty because he had frequented the place before. Upon leaving Lou’s Tavern, Gray said that he stopped at a bar between that place and the Bellevue House in Lang-home and that from there he went on to the Bellevue House where he met Buchanan by accident. He remembered the bartender, “Phil,” at the Bellevue House. He recalled that another friend of his, a Mr. *152 Gano, left the Bellevue House shortly after they had entered the place; and he recalled the exact route of travel he took when driving Buchanan’s car from the bar next to Frank’s Market over to the Village Inn.
As noted before, the sole issue raised by defendant in his post trial motions and at argument related to the comments of the trial judge in his charge concerning the question of intoxication. These remarks follow:
“Mention has been made here of the intoxication or alleged intoxication of this defendant. I would say to you that any self-induced — when one intoxicates himself — any self-induced intoxication, is no defense to a criminal act, unless the circumstances show that it is so overwhelming an intoxication as to set aside the person’s reason all together so he does not know what he is about and does not know the nature of his act. It is only when self-intoxication reaches that point and quantity that you consider it as a defense. I would say to you in this case, intoxication is not really a defense at all, in any event, and I as I view the law and the facts of this case. This defendant does not say by virtue or by way of a defense, I was there, I did it, but I was so intoxicated I don’t know anything about it.
“I believe the facts justify your finding that he knew nothing about it, if you believe his testimony, that he knew nothing about Mr. Buchanan’s intention to go on the roof to steal, etc., and therefore, he says I’m not guilty of the offense. He, himself, by way of background says he had been drinking all day, but, you will recall — if I remember his testimony — he does not say, I was involved in criminal activity, but I was so intoxicated that I should be *153 excused, because that is the nature of what that defense is. I don’t think you should concern yourself about the defense of intoxication, it is not in the case under all the facts that have been put before you. This case must be determined according to your view of the evidence.”
The court further told the jury “On the other hand you have this defendant’s testimony as to his version of what happened that night. And, I would say to you that if you believe the defendant’s version, he is guilty of no crimes, because he explained not only his presence in Mr. Buchanan’s presence, but he also explained the tools in his pocket so that he says he did not- illegally attempt to use them for illegal purposes. If you believe his testimony and reject the police testimony, he is guilty of no offense whatsoever.”
And again the court said to the jury: “And, I have instructed you this [defendant’s drunkenness] is not a defense in this case, because the defendant has testified not that he engaged in criminal activity, and has attempted to excuse himself on the basis of drunkenness or intoxication, but rather, that he did not engage in the conspiracy, that he did not know anything about the alleged burglary and larceny and possession of burglary tools on the part of Mr. Buchanan. So, if you would believe Mr. Gray’s testimony as to what was going on in his mind and what he knew or didn’t know about Mr. Buchanan’s activities of the evening, Mr. Gray would be guilty of no offense whatsoever . . .”
Not a great deal of discussion pertaining to the defense of intoxication can be found in the Pennsylvania appellate court decisions except insofar as that defense is considered in homicide cases where *154 the effort is made to avoid a finding of first degree murder by reason of defendant’s self-intoxication rising to such a height as to show the impossibility or improbability of the existence of the specific intent to kill required in first degree murder. See, e.g., Commonwealth v. Simmons, 361 Pa. 391, 410 (1949); cert. denied, 338 U. S. 862 (1949); Commonwealth v. Walters, 431 Pa. 74 (1968). Gross intoxication is also considered as a mitigating factor in the determination of the sentence following a finding of first degree murder: Commonwealth v. Thompson, 381 Pa. 299, 303 (1955).
However, the general rule may be stated in this fashion. Voluntary intoxication is not a defense nor an excuse for the commission of a crime no matter how severe that intoxication may be where no specific intent to commit the act in question is a necessary element of the crime. Thus, where a general criminal intent only is involved in the crime charged, as in the case of the commission of an act which is prohibited by statute, the defense of intoxication is entirely inappropriate. See P.L.E. Criminal Law, §46. Reference to this rule is made in 22 C.J.S. Criminal Law §66 where, after stating the rule in general terms, the treatise goes on to say, at page 215:
“. . . despite his voluntary drunkenness at the time one may, subject to the qualifications hereinafter pointed out, be guilty of any crime, such as assault, assault and battery, burglary, illegal possession of intoxicating liquor, larceny, passing a false and worthless check, rape, assault with intent to rape, or robbery.”
Where a specific criminal intent is a necessary element of the crime, however, an exception to the general rule is made if the evidence supports a *155 finding that defendant was intoxicated to such a degree that he lacked the mental capacity to form the intent. Although P.L.E., supra, finds the exception to the general rule to apply only in those cases of felonious homicide in which a specific intent to kill is required for first degree murder, it appears clear that the exception should apply with equal force to any crime where a particular and specific criminal intent is a necessary element of the crime.
The exception to the general rule that self-intoxication is no defense, however, is based upon the theory not that drunkenness excuses the defendant for the criminal act which he committed, but rather upon the theory that where defendant’s intoxication is so gross as to render him incapable of forming the requisite specific intent, the crime charged has not, in fact, been committed since, in such a case, an essential element of the crime is lacking.
When the facts of the defense arguably support an inference that defendant at the time of the commission of the crime was so intoxicated as to be dethroned of his mental powers and thus unable to form, or entertain, the specific intent which is a necessary ingredient of the crime charged, the fact finder should be permitted to make this determination and, upon so doing, return a verdict of not guilty. See 22 C.J.S. Criminal Law, §68. But, as noted in this commentary, great caution should be used in applying this rule so that undue weight may not be attached to the mere fact of intoxication. Such a defense should he scrutinized carefully: Commonwealth v. Ault, 10 Pa. Superior Ct. 651 (1899). And if a person decides to commit a crime and then becomes intoxicated but nonetheless commits the criminal act, the intoxication is no defense: 22 *156 C.J.S. §68. Without doubt, when supported by evidence, the question of whether or not a defendant’s intoxication should relieve him of criminal liability for his acts is one which should be submitted to a jury and cannot be determined as a matter of law by the court: Commonwealth v. Johnson, 410 Pa. 605, 610 (1963). And, in such case, defendant must prove by a fair preponderance of the evidence that the degree of his intoxication prevented the formation of the requisite specific intent: Commonwealth v. Samuel Jones, 355 Pa. 522, 531-32 (1947); Commonwealth v. Barnosky, 436 Pa. 59, 63 (1969). Although most of our case law dealing with this subject involves the charge of murder and the question of the degree of guilt as affected by intoxication, it is clear, as indicated heretofore, that the rationale of the exception to the general rule of law requires that the defense of intoxication be available to the accused whenever the crime charged includes as an essential element any specific intent as distinguished from a general criminal intent. Our courts have recognized this: Commonwealth v. Ault, supra, larceny, receiving stolen goods; Commonwealth v. Bell, 189 Pa. Superior Ct. 389 (1959), burglary. Nonetheless, before the jury should be permitted to consider whether or not a defendant ought to be relieved of the criminality which would attach to his acts were it not for his voluntary intoxication, there should be substantial evidence in the record on this score for the jury’s consideration. It must be remembered that intoxication is not an excuse for crime. The effect of alcoholic beverages upon the mind, actions and inhibitions of a person is well known. All persons, including this defendant, have the duty to abstain from placing themselves in danger of committing criminal acts after the mind has become *157 less discriminating, but perhaps more sinister, and the backbone has become weak as a result of overindulgence.
No decision may be found which holds that intoxication, by itself, is sufficient to erase the otherwise apparent existence of the element of specific intent: Commonwealth v. Walters, 431 Pa. 74, 83 (1968). The classic example of testimony in support of a defense of self-intoxication sufficient to permit a jury to deal with the question upon evidence, rather than upon mere speculation, is found in those cases in which the defendant testifies that he has no knowledge or memory of the events surrounding the criminal activity. For example: The defendant testified that he had no recollection of the shooting (Kane v. United States, 399 F.2d 730 (1968), cert. denied 393 U. S. 1057 (1969)); he did not recall anything that happened (Commonwealth v. Simmons, supra); the defendant testified about drinking and becoming intoxicated but said he had no recollection of what he did thereafter (Commonwealth v. Heatter, 177 Pa. Superior Ct. 374 (1955)); because of intoxication he was unable to recall what happened (Commonwealth v. Reid, 432 Pa. 319 (1968)); he was intoxicated and didn’t know too much about the stabbing (Commonwealth v. Walters, supra); because of his intoxication he could remember nothing (Commonwealth v. Bell, 189 Pa. Superior Ct. 389 (1959)). In such a case, it goes without saying that there is evidence in the record to support a finding of intoxication to that degree which will take the case out of the general rule. The jury’s determination under proper instructions would then turn upon the credibility to be attached to defendant’s testimony and the weight to be given any corroborative evi *158 dence rather than upon mere speculation growing out of argument of counsel.
In the case before us, Gray testified to the events of the evening. He had a full recollection of the activity he was engaged in and of his mental processes during the crucial hours. He testified with precision as to what he did at or about 2 a.m. when he left the company of Buchanan who was next found on the roof of Frank’s Market. In the following exchange between his counsel and himself, defendant did not equivocate:
Q. “Was there ever any agreement between you and Mr. Buchanan to burglarize Frank’s Unity Market?”
A. “I advised Mr. Buchanan not to burglarize anything”.
Q. ‘Was there any agreement between you and Mr. Buchanan to go to burglarize Frank’s Unity Market?”
A. “No.”
Unsupported by testimony from any other source, defendant told the jury that he had been drinking for many hours, that he was “drunk,” that he was “intoxicated.” Notwithstanding this, the defense upon which he sought acquittal was not that of intoxication, although this was argued by his counsel to the jury, but rather his lack of knowledge of and his nonparticipation in Buchanan’s criminal activities during the early morning hours of January 31, 1968. This defense was given squarely to the jury by the court in its charge and the issue was resolved against defendant. The evidence simply did not support submission to the jury of the issue of defendant’s intoxication as a defense to the alleged criminal acts. The argument of intoxication as a defense in this case is somewhat akin to a situation where a defen *159 dant, although acknowledging that he was present at the scene of the crime at the time of its commission, testified that he was elsewhere either before or after the time of the crime and then, nonetheless, argued alibi.
An interesting case may be found on this subject, in the context of our discussion, in Commonwealth v. Brabham, 433 Pa. 491 (1969). Although not cited by counsel in brief or argument, we believe that it is ample authority for our holding in this case. In Brabham, defendant left work with a co-worker, cashed his paycheck and began drinking. Sometime later he gave a $20 bill to a lady friend with a request that she purchase some whiskey for him. She did neither that nor return with the $20, which behavior apparently angered defendant. He found her at a bar sometime later and made threats when she failed to turn over his money. After being put out of the bar, defendant returned a few minutes later carrying a rifle with which, and without further preliminaries, he shot her, causing death. The defense was threefold, first that the killing was unintentional and accidental, second that it was in self-defense, and third that the defendant was intoxicated. Following conviction of second-degree murder, defendant on appeal contended that the court withdrew from the jury any consideration of defendant’s state of alleged intoxication when it said:
“There is no testimony in this case that this man was so under the influence of intoxicating liquor that his mental faculties were affected to the degree that he could not form the intent to commit and perform the act which he in fact did, if you believe that he did do the thing which the witnesses have testified that he did . . .
“. . . now of course intoxication may be a defense *160 to a crime, but in order for intoxication to be a complete defense to crime, it must exist to such an extent that the person is not able to form an intent to commit the crime itself . . .”
The Supreme Court upon review, after outlining the general rule noted above to the effect that voluntary drunkenness neither exonerates nor excuses a person from the legal consequences of his criminal acts, citing Simmons and Walters, supra, held that there was no error in the charge of the court. See page 494. It would seem that in Brabham, as in the case before us, the intoxication testimony did not reach the standard fixed by the rule of law which would permit its consideration by the jury. As in Brabham, the trial judge here informed the jury of the nature of the legal defense and then further informed them that the evidence before the jury did not meet the legal standard.
Assuming, arguendo, that the quality of defendant’s intoxication testimony was such that, by inference, a jury would be justified in finding that, by reason thereof, he lacked the specific intent to commit burglary or larceny, nonetheless, the failure to give the jury this question would not be harmful error. As noted above, the authorities point out that only where a specific intent is an essential element of a crime is evidence of intoxication admissible to show that a defendant was not capable of forming such intent. In this connection, see also Treatise on Law of Crime by William L. Burdick, 2 Vols. (1946), sec. 168. But where a general criminal intent is all that is required, as in the case of conspiracy, voluntary intoxication, no matter what the degree thereof, does not prevent the formation of such general intent. See Esmond v. Liscio, 209 Pa. Superior Ct. 200, 208 (1966), where the issue was *161 punitive damages growing out of an assault and battery.
The evidence in this case was ample to support the guilty verdict upon the conspiracy charge; The acts of defendant’s coconspirator, Buchanan, were, therefore, the acts of defendant and he shares guilt with Buchanan for the related crimes.
ORDER
And now, July 22, 1970, defendant’s motions for a new trial and in arrest of judgment are denied, overruled and dismissed. Defendant is directed to appear before the court for sentence upon a day certain to be fixed by the district attorney.