Commonwealth *v.* McCausland, Appellant.

Argued November 22, 1943. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Wendell R. Good,* for appellant.

*Burton R. Laub,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 3, 1944:

Defendant, William F. McCausland, aged 30 years, was indicted and tried for the murder of Leo Knoll in the City of Erie. The jury returned a verdict of guilty

in the first degree and recommended the death penalty. The court below refused defendant's motion for a new trial and imposed a sentence of death. Defendant now appeals.

The defendant shot in the back and killed Leo Knoll with a high-powered rifle on March 4, 1943, at about 5.30 P. M. The killing took place in a licensed cafe in the presence of a number of witnesses. Defendant and deceased had made a wager, based upon a play of words and conducted in a friendly spirit, which the defendant lost, and as a result, forfeited the stake of ten dollars. Defendant, without demanding the return of his money, or making any comment whatsoever, left the cafe. He thereupon walked directly to his home, about a block away, and, assisted by his wife, searched for bullets for his rifle. After obtaining the bullets, defendant took the rifle, returned to the cafe, and upon entering the front door, behind decedent, took two or three steps and shot decedent in the back. After the shooting, defendant stated "I have been wanting to do this for some time". Defendant was subsequently disarmed and taken to the police station for questioning. The following morning he signed a written confession.

Unquestionably defendant's resentment over the declared forfeiture of his ten dollars, following the bet, was the motive for the killing. All of the eye witnesses testified, however, that there was no argument, and everything appeared friendly. The defendant in his signed confession, did say: ". . . I did not like it because I lost. I wanted my money back but (decedent) would not give it to me. When (decedent) would not give it to me I said I'll get it or else". No other witness corroborated this statement.

We have examined the testimony with great care. We are all convinced that this was a wilful, deliberate, and premeditated killing, and therefore murder in the first degree, as defined by the Act of June 24, 1939, P. L. 872, section 701, 18 PS section 4701. See also *Common-*

*wealth v. Drum,* 58 Pa. 9; *Commonwealth v. Blanchard,* 345 Pa. 289, 26 A. 2d 303; *Commonwealth v. Earnest,* 342 Pa. 544, 21 A. 2d 38; *Commonwealth v. Schurtz,* 337 Pa. 405, 10 A. 2d 378.

The defenses offered were intoxication and mental incapacity not amounting to insanity. There was considerable testimony concerning the quantity of beer which defendant had consumed prior to the killing. Defendant, with no corroboration, testified as to the number of bottles he had consumed *before* coming into the cafe; various witnesses testified as to what defendant drank in the cafe prior to the killing. All of the witnesses (except defendant's wife) expressed the opinion that defendant exhibited no evidence of intoxication before, at the time of, or after the killing. The wife, in her examination before the police chief, stated that when defendant came in for his gun, although she smelled liquor on his breath, he appeared "perfectly normal". On the stand, as a witness for the defense, she testified that "He was glassy-eyed and just didn't seem to know what he was doing at all". Intoxication sufficient to deprive the mind of power to form a design with deliberation and premeditation, and to properly judge the legitimate consequences of an act, will reduce a killing from murder in the first degree to murder in the second degree. *Commonwealth v. West,* 204 Pa. 68, 53 A. 542; *Commonwealth v. Kline,* 341 Pa. 238, 19 A. 2d 59. The fact of such intoxication, however, is for the jury to determine, and in the present case its finding was consistent with the weight of the evidence.

The evidence of defendant's partial insanity is meager. Defendant's mother testified that he had repeated the fourth grade in school, and had left before he completed the sixth grade at the age of fifteen. He first worked in the coal mines, and has been drinking since he was sixteen. Defendant's medical expert testified that defendant "knew the difference between right and wrong". He classified him as a "constitutional

psychopath, inferiority complex"; "half-crazy". The doctor called for the Commonwealth testified that defendant was "normal from the legal viewpoint, that is, he at no time gave any evidence of insanity". He said, ". . . I would say that he was not the type of individual that they'd have in the army, for instance. I would say he mentally—I should say intellectually, not mentally but intellectually, he would compare with a group that is just a little below the average in intelligence but that does not make him insane. I would agree that he is a drunkard, a bum, emotionally unstable, unreliable, but that does not make him legally insane." The proof offered of defendant's low mentality did not establish that he was incapable of forming the wilful intent to kill, or of judging the consequences of his acts. It certainly did not establish such legal insanity as to constitute a complete defense to the charge of murder, and was not offered for that purpose.

Finally, there was no evidence of extreme provocation by the deceased and passion on the part of the defendant. Even if his anger had been aroused by the loss of the bet with the deceased, there was ample time for it to cool during the walk to his home, the search for his gun and bullets, and the return to the cafe. His conversation at the bar, at his home, and with an acquaintance on the street as he walked back to the cafe, betrays no blinding rage or passion, but rather indicates calm deliberation and premeditation.

All of these matters were for the jury, under proper instruction from the court. We have carefully read the charge and the opinion of the court en banc dismissing defendant's motion for new trial. The charge was accurate, comprehensive and most impartial. We also approve what was written in denying a new trial. The assignments of error are devoid of merit.

Judgment is affirmed and the record remitted to the end that sentence may be executed.